**THOMPSON LAW, LLC**
Colin M. Thompson, Esq.
J.E. Tenorio Bldg.
PMB 917, Box 10001
Saipan, MP 96950
Telephone: (670) 233-0777
Email: cmtlaw@live.com

**AARON HALEGUA, PLLC**
Aaron Halegua
524 Broadway, 11th Floor
New York, NY 10012
Telephone: (646) 854-9061
Email: ah@aaronhalegua.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| PROSPERO A. ARMIA, NEMENCIO Q. DE LEON, GIOVAN MALAZARTE, IAN R. ALCOSEBA, RANIE E. CELESTIAL, RUDY B. NARAJA, VICTOR P. FRAGINAL, REYMAR T. PINEDA, JERRY TORTOR, JERRY VALLES and EDMAR YANGYANG, | Civil Action No. 23-cv-00013 |
| Plaintiffs, | |
| vs. | **FIRST AMENDED COMPLAINT** |
| RJCL CORPORATION *dba* RNV CONSTRUCTION, HOMESMART CORPORATION *dba* BEST DEAL GENERAL MERCHANDISE, PARAGON CONSTRUCTION *dba* COREPLUS CONSTRUCTION, WANDERVILLA CORPORATION *dba* VILLA ROYAL PAWNSHOP, RUEL R. VILLACRUSIS, MICHELLE RUEDA, JANE RUEDA and SHERWIN RESURRECTION, | |
| Defendants. | |

**COMES NOW**, Plaintiffs, Prospero A. Armia, Nemencio Q. De Leon, Giovan Malazarte, Ian R. Alcoseba, Ranie E. Celestial, Rudy B. Naraja, Victor P. Fraginal, Reymar T. Pineda, Jerry Tortor, Jerry Valles, and Edmar Yangyang (collectively, the "Plaintiffs"), by and through their counsel, allege as follows:

## INTRODUCTION

1.     Ruel Villacrusis ("Villacrusis"), along with his relatives Jane Rueda and Michelle Rueda, operate a variety of companies in the Commonwealth of the Northern Mariana Islands ("CNMI") engaged in the construction business and other ventures. (These individuals and entities are jointly referred to as "RNV Defendants"). Plaintiffs are a group of Filipino workers who came to the CNMI to work for RNV Defendants based on promises of fair compensation, free housing and medical care, and humane working conditions.

2.     When Plaintiffs arrived in Saipan, however, RNV Defendants did not fulfill the promises made in the contracts executed in the Philippines; indeed, Plaintiffs were told that these were just a formality to get their CW visa. Despite receiving at least $88 million in Federal Emergency Management Agency ("FEMA") contracts, RNV Defendants provided neither free housing, free food, nor free medical care. RNV Defendants failed to pay Plaintiffs for all their hours, pay them the prevailing wage, or pay the proper overtime rates. RNV Defendants took numerous deductions from Plaintiffs' paychecks without their consent, including for housing and for "other" unspecified items, in violation of federal and local laws and regulations. Moreover, the housing provided by RNV Defendants was unsanitary and inadequate: up to seven workers shared a single room; there was no hot water; dogs, cats, and rats entered the barracks and defecated on the floor; and cockroaches infested the kitchen cabinets.

1

3.      RNV Defendants engaged in a pattern of intimidation and coercion to compel Plaintiffs to continue working under these conditions. Whenever Plaintiffs inquired about the illegal deductions, Jane Rueda threatened to not renew their visas and to send Plaintiffs back to Philippines at their own cost. Villacrusis intimidated Plaintiffs by telling them that complaining to the labor authorities would be futile. RNV Defendants even instructed two Plaintiffs to lie to immigration authorities about the conditions of their employment, and then terminated them for telling the truth to these authorities.

4.      After these terminations, several Plaintiffs filed a complaint with the CNMI Department of Labor and then later brought this lawsuit to complain about RNV Defendants' labor practices. In response, RNV Defendants engaged in a retaliation campaign against Plaintiffs, including by threatening to deport them, offering a $2,000 bounty for information on the whereabouts of one Plaintiff, blacklisting Plaintiffs from further employment in Saipan, and intimidating them by conducting surveillance of them and coming to their residences. The retaliation by RNV Defendants has caused Plaintiffs severe emotional distress and left some Plaintiffs afraid to leave their homes. The retaliation and threats by RNV Defendants also caused several former employees who were interested in joining the lawsuit to change their mind.

5.      RNV Defendants' conduct violates various federal laws, Occupational Safety and Health Administration ("OSHA") regulations, federal regulations governing the CW program, as well as CNMI laws and regulations. Accordingly, Plaintiffs now bring this complaint against the RNV Defendants for forced labor pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA"), wage violations under the Fair Labor Standards Act ("FLSA"), breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, fraudulent misrepresentation, negligent misrepresentation, termination in violation of public policy, retaliation in violation of the FLSA, and intentional infliction of emotional distress.

6.    Plaintiffs also bring claims for retaliation in violation of the FLSA and intentional infliction of emotional distress against Defendant Sherwin Resurrection ("Resurrection"), an employee of RNV Defendants who participated in the surveillance of and retaliation against Plaintiffs.

## JURISDICTION AND VENUE

7.    The Court has jurisdiction over Plaintiffs' TVPRA and FLSA claims pursuant to 28 U.S.C. § 1331.

8.    The Court has supplemental jurisdiction over Plaintiffs' related claims arising under CNMI law pursuant to 28 U.S.C. § 1367(a).

9.    Venue is properly placed in the United States District Court for the Northern Mariana Islands in that all parties were present in, and all acts alleged and complained of occurred in the CNMI.

## PARTIES

10.    Plaintiffs Prospero A. Armia ("Armia"), Nemencio Q. De Leon ("De Leon"), Giovan Malazarte ("Malazarte"), Ian R. Alcoseba ("Alcoseba"), Ranie E. Celestial ("Celestial") Rudy B. Naraja ("Naraja"), Victor P. Fraginal ("Fraginal"), Reymar T. Pineda ("Pineda"), Jerry Tortor ("Tortor"), Jerry Valles ("Valles"), and Edmar Yangyang ("Yangyang") are citizens of the Republic of the Philippines.

11.    At various times relevant to this complaint, Plaintiffs resided in the CNMI and were employed by and/or worked for RNV Defendants.

12.    On information and belief, Defendant RJCL Corporation *dba* RNV Construction ("RJCL") is a domestic corporation organized under CNMI law with its principal place of business in Saipan, CNMI.

13.    Villacrusis is a director of RJCL, the company's Vice-President and Secretary-Treasurer, and its registered agent. He owns 35,500 of the 40,000 shares. The other director, officer,

and shareholder of RJCL is Ciara Luz D. Villacrusis, who lists an address in the Philippines and is believed to be a relative of Villacrusis. In 2022, RJCL listed its business activities as general contractor, money transmitter, manpower services, and equipment rental.

14.     On information and belief, Defendant Homesmart Corporation *dba* Best Deal General Merchandise ("Homesmart") is a domestic corporation organized under CNMI law with its principal place of business in Saipan, CNMI.

15.     Villacrusis is the sole director, sole officer, and sole shareholder of Homesmart.

16.     In 2022, Homesmart listed its business activities as pawnbroker, retail general merchandise, laundromat, and commercial help supply services.

17.     On information and belief, Defendant Paragon Construction *dba* Coreplus Construction ("Coreplus") is a domestic corporation organized under CNMI law with its principal place of business in Saipan, CNMI.

18.     The directors and officers of Coreplus include Annabelle Irang, Florefie Villaraza, and Michelle Rueda. These individuals are believed to be relatives of Villacrusis.

19.     In 2022, Coreplus listed its business activities as general contractor and manpower services.

20.     On information and belief, Defendant Wandervilla Construction *dba* Villaroyal Pawnshop ("Wandervilla") is a domestic corporation organized under CNMI law with its principal place of business in Saipan, CNMI.

21.     Villacrusis is the sole director, sole officer, and sole shareholder of Wandervilla.

22.     RJCL, Homesmart, Coreplus, and Wandervilla are jointly referred to as the "Corporate Defendants."

4

23.    Defendant Villacrusis is a resident of the CNMI and believed to be a citizen of the Philippines.

24.    Defendant Michelle Rueda is a resident of the CNMI and believed to be a citizen of the Philippines.

25.    Defendant Jane Rueda is a resident of the CNMI and believed to be a citizen of the Philippines.

26.    On information and belief, Villacrusis, Michelle Rueda, and Jane Rueda are all related.

27.    On information and belief, Michelle Rueda is a manager for the Corporate Defendants, and on information and belief, performs work related to payroll and accounting.

28.    On information and belief, Jane Rueda is a manager for the Corporate Defendants and handles human resources matters.

29.    Villacrusis, Jane Rueda, Michelle Rueda, and the Corporate Defendants are jointly referred to as the "RNV Defendants."

30.    On information and belief, the key officers, directors, managers, and supervisors at the Corporate Defendants are relatives of Villacrusis.

31.    Defendant Resurrection is a resident of the CNMI and believed to be a citizen of the Philippines.

32.    During the times relevant to this complaint, Defendant Resurrection was an employee of RNV Defendants.

## STATEMENT OF FACTS

### Plaintiffs' Recruitment by RNV Defendants

33.    Plaintiffs were all recruited from the Philippines to work for the RNV Defendants in the CNMI on CW-1 visas.

5

34.    Most Plaintiffs have only limited English proficiency. They generally cannot fully understand when someone speaks to them in English. They also are unable to fully comprehend documents written in English.

35.    At the time of recruitment, Plaintiffs were promised by RNV Defendants that they would receive, *inter alia*, overtime pay when they worked over 40 hours in a week; overtime pay for work on a rest day or holiday; free food and housing; free medical care; no deductions other than those required by CNMI law or Social Security; and that the employer would pay for their airline ticket back to the Philippines at the end of their employment.

36.    Plaintiffs were also provided written employment contracts at the time of their hiring, which were used to obtain a work visa for the CNMI.

37.    The Employment Contract for Plaintiff Armia for the period from October 1, 2020 to September 30, 2021 is attached as **Exhibit A**. Several of the other Plaintiffs, such as Plaintiffs Naraja, Alcoseba, Pineda, and Valles also received an Employment Contract that contained terms similar to those in **Exhibit A** (the "Employment Contracts").

38.    The Employment Contracts provided, in paragraph D, that the employee shall work for 40 hours per week for an hourly wage that ranged from $8.08 per hour to $9.76 per hour, and that the employee shall perform overtime work for a wage of 1.5-times the regular hourly rate.

39.    The Employment Contracts provided, in paragraph E, that other than CNMI taxes and Social Security, "[n]o other deductions from the Employee's compensation shall be made by the Employer …".

40.    The Employment Contracts provided, in paragraph G, that "the Employer shall be responsible for the payment of the Employee's return airplane ticket to his/her point of hire at the expiration or termination of the Employment Contract, regardless of the nature of the termination."

6

41.     The Employment Contracts provided, in paragraph J, that the contract may only be terminated "by giving the other party TEN (10) days advance written notice and only after an unsuccessful good faith attempt to settle any dispute has been made with the Chief of Labor or his designee."

42.     Other Plaintiffs received a different version of the employment agreement when they were initially hired. A copy of the "Standard Employment Contract" provided to Plaintiff Malazarte is attached as **Exhibit B**. Plaintiffs Fraginal, Tortor, Valles, and Yangyang also received a Standard Employment Contract that contained terms similar to those in **Exhibit B** (the "Standard Employment Contracts").

43.     The Standard Employment Contracts provided that the employee would receive 150% of his regular hourly rate for work beyond regular working hours, and 200% of his regular hourly rate for work on rest days and holidays.

44.     The Standard Employment Contracts provided that the employee would receive vacation leave and sick leave as provided in the CNMI Labor Law.

45.     The Standard Employment Contracts provided that the employee would receive free transportation from Saipan to the Philippines at the conclusion of his employment when it is not due to the fault of the employee.

46.     The Standard Employment Contracts provided that the employee would receive free food and suitable housing.

47.     The Standard Employment Contracts provided that the employee would receive free emergency medical and dental services, and free medicine.

48.     Plaintiff Celestial and Plaintiff Pineda received a document that was labeled as a Contract of Employment. The terms were similar to the other contracts, but also stated that the

employee's working hours would be a maximum of 8 hours per day, six days per week. A copy of the contract for Plaintiff Celestial is attached as **Exhibit C**.

49.     Plaintiff De Leon never received any copy of his employment contract with RNV Defendants.

50.     On information and belief, RNV Defendants never provided a copy of the aforementioned employment contracts to Plaintiffs in any language other than English.

Plaintiffs' Employment by RNV Defendants

51.     Plaintiffs generally were hired on one-year contracts that needed to be renewed annually for Plaintiffs to maintain a valid work visa.

52.     When RNV Defendants renewed Plaintiffs' contracts, they often provided Plaintiffs with only the signature page of the new contract and asked Plaintiffs to sign it without having the opportunity to review the contract in its entirety.

53.     Plaintiffs were generally not provided copies of their renewed contracts.

54.     RNV Defendants' failure to provide a copy of the employment contract to Plaintiffs violates 3 CMC § 4931(h).

55.     After signing the renewed contracts, Plaintiffs often began to receive paychecks from a different corporate entity, even though their work remained the same.

56.     Plaintiff Armia worked for RNV Defendants from approximately June 2015 to June 2023. Armia was initially contracted to work for RJCL as a maintenance and repair worker. However, there were times during this period when Coreplus was the petitioner for Plaintiff Armia's visa and Armia also received paychecks from Coreplus. Nonetheless, his daily time sheets throughout this period were always kept by RNV Construction.

*Figure 1: Prospero Armia Time Sheet*

57.    When Plaintiff Armia requested copies of his renewed contracts with other entities, such as Coreplus, Jane Rueda told him that he did not need a copy because it was the "same company" with the "same owner."

58.    Plaintiff De Leon worked for RNV Defendants from approximately July 2015 to June 2023 as a carpenter. Plaintiff De Leon was initially hired by RJCL in June 2015. However, from November 2021 to December 2021, De Leon received paystubs from Coreplus. For the period from October 2022 to October 2023, Plaintiff De Leon's CW-1 visa was sponsored by Coreplus. Plaintiff De Leon was never provided a copy of an employment contract with Coreplus or any of the other RNV Defendants.

59.    Plaintiff Malazarte worked for RNV Defendants from approximately November 2019 to September 2023. He was contracted by Homesmart as a retail salesperson from November 2019 to November 2020. He subsequently worked for RJCL as an electrician and maintenance worker from

November 2020 to September 2023. Even while he was working at Homesmart, Malazarte's daily time sheets were kept by RNV Construction.



*Figure 2: Giovan Malazarte Time Sheet*

60.    Plaintiff Alcoseba worked for RNV Defendants from approximately September 2020 to September 2023. He was contracted by RJCL as a maintenance and repair worker.

61.    When Plaintiff Alcoseba arrived in Saipan for the first time, Jane Rueda told him and other new employees that the initial contracts signed in the Philippines were just a formality to get employees approved for the CW-1 visa.

62.    Plaintiff Celestial worked for RNV Defendants from approximately August 2020 to September 2023. He was initially contracted by RJCL as a fixtures and equipment repairer. However, from approximately April 2021 until September 2021, he was paid by Homesmart. Afterwards, from approximately November 2021 to June 2023, he worked for RJCL again.

63.    Plaintiff Valles worked for RNV Defendants from approximately October 2017 to September 2020. He was contracted by RJCL as a painter and by Wandervilla as a maintenance and repair worker.

64.    Plaintiff Valles was terminated by RNV Defendants after his parents brought a lawsuit in the Philippines to redress their mistreatment while working for Villacrusis and his family members in the Philippines.

65.    Plaintiff Naraja worked for RNV Defendants from approximately September 2020 to September 2023. He was contracted by RJCL as a maintenance-electrical worker.

66.    Plaintiff Fraginal worked for RNV Defendants from approximately March 2020 to September 2023. He was contracted by RJCL as a maintenance and repair worker.

67.    Plaintiff Tortor worked for RNV Defendants from approximately October 2017 to September 2023. He was contracted by RJCL as a mason/leadman.

68.    Plaintiff Pineda worked for RNV Defendants from approximately July 2020 until July 2023. He was contracted by RJCL as a maintenance repairer.

69.    Edmar Yangyang worked for RNV Defendants from approximately March 2020 to September 2023. He was contracted by RJCL as a maintenance and repair worker.

<u>CW Program Requirements</u>

70.    Title 20, Section 655.23 of the Code of Federal Regulations sets forth the "Assurance and obligations of CW-1 employers" (hereinafter, the "CW Regulations").

71.    Concerning the rate of pay, the CW Regulations provide: "The offered wage in the work contract equals or exceeds the highest of the prevailing wage, Federal minimum wage, or Commonwealth minimum wage." 20 CFR § 655.423(a)(1).

72.    On information and belief, RNV Defendants violated the CW Regulations by failing to offer and pay the prevailing wage for work pursuant to a FEMA contract.

73.    Concerning the payment of wages, the CW Regulations provide: "The employer must pay at least the offered wage, free and clear, during the entire period of the *CW-1 Application for Temporary Employment Certification* granted by OFLC." 20 CFR § 655.423(a)(1).

74.    RNV Defendants violated the CW Regulations by not paying Plaintiffs their wages "free and clear" because they required wages to be paid back by the Plaintiffs and made unauthorized deductions.

75.    Concerning any deductions, the CW Regulations provide: "The work contract must specify all deductions not required by law that the employer will make from the worker's pay; any such deductions not disclosed in the work contract are prohibited." 20 CFR § 655.423(c).

76.    RNV Defendants violated the CW Regulations by making deductions from Plaintiffs' wages that were not specified in their contracts.

77.    Concerning travel, the CW Regulations provide that the employer must pay for the workers' travel to the CNMI and their return trip home. 20 CFR § 655.423(j).

78.    On information and belief, RNV Defendants violated the CW Regulations by making Plaintiffs pay for their visa and/or travel costs by making deductions from their wages.

79.    Concerning work contracts, the CW Regulations provide that for a CW-1 worker who is changing employment to a subsequent employer, a copy of the work contract "must be provided no later than the time an offer of employment is made by the subsequent CW-1 employer"; the documents "must be provided in a language understood by the worker"; and the contract "must contain all of the provisions required to be included by this section [of the regulations]." 20 CFR § 655.423(l).

80.    RNV Defendants violated the CW Regulations by failing to provide Plaintiffs with a written copy of their renewed contracts in a language they understand, or any copy at all.

81.    Concerning retaliation, the CW Regulations provide that an employer may not itself, or through another party, "intimidate, threaten, restrain, coerce, blacklist, discharge, or in any manner discriminate against" a person who has engaged in protected activity, including a person who filed a complaint or instituted a proceeding under any related laws or regulations, testified or is about to testify in a proceeding, consulted with an attorney or worker advocate, or otherwise asserted their rights under any applicable Federal or Commonwealth laws and regulations. 20 CFR § 655.423(m).

82.    As described below, RNV Defendants violated the CW Regulations by, *inter alia*, threatening not to renew Plaintiffs' contracts and to make them pay for their own transportation back to the Philippines; terminating them for providing information to Federal agents; intimidating them from reporting to the labor authorities; threatening to have them deported; and blacklisting them from getting hired by other employers in the CNMI.

<u>CNMI Laws and Regulations</u>

83.    Commonwealth Code, Title 3, Division 4, Part 2, Chapter 4 governs the employment of foreign nationals in the CNMI.

84.    The "Employment Rules and Regulations" promulgated by the CNMI Department of Labor are set forth in Title 80, Subchapter 80-20.1. The rules and regulations were promulgated pursuant to the Immigration Conformity Act of 2010, PL 17-1, the Employment Act of 2007, PL 15-108, the Minimum Wage and Hour Act, as amended, and Public Laws No. 11-6, 12-11, and 12-58 as amended.

13

85.    Concerning deductions, CNMI law provides that only deductions defined in regulations, specified in the employment contract, and itemized in wage documentation are permissible. 3 CMC § 4931(g).

86.    Concerning deductions, CNMI regulations provide that "The amount of and reason for each deduction shall be identified on the wage statement or other documentation of wage payment provided to the employee." NMIAC § 80-20.1-330(m)(3).

87.    RNV Defendants made deductions from Plaintiffs' paychecks that were not defined in regulations, not specified in their contract, and not always specified in the wage documentation provided to Plaintiffs.

88.    Concerning the provision of contracts, CNMI law provides that the employer must provide each foreign worker "promptly after arrival in the Commonwealth a copy of the approved employment contract." 3 CMC §4931(h).

89.    Concerning the provision of contracts, CNMI regulations provide that a copy of the employment contract shall be provided to the foreign worker "a reasonable time after signing by the parties." NMIAC § 80-20.10-330(n).

90.    Concerning modifications to contracts, CNMI law provides: "Any change to an existing approved employment contract shall be implemented or performed only with the prior approval of the Secretary." 3 CMC §4931(j).

91.    Concerning responsibility for the costs of repatriation, CNMI law provides that the "last employer of record" of a foreign national worker is responsible for the costs of their repatriation. 3 CMC § 4954.

92.    Concerning loans and advances, CNMI regulations provide that any loans and advances must be agreed to in writing; loans may need be made for employment-related fees; and the repayment

of loans and advances "may not be accomplished pursuant to a deduction from wages absent a court or administrative order." NMIAC § 80-20.10-330(m)(4).

93.    Concerning medical expenses, CNMI regulations provide that "Employers shall pay all expenses of necessary medical care for foreign national workers except that co-pay requirements under insurance contracts may be deducted from wages." NMIAC § 80-20.10-330(o).

94.    Concerning the costs of repatriation, CNMI regulations provide: "The last employer of record is responsible for all costs of repatriation of a foreign national worker." NMIAC § 80-20.10-330(u).

95.    Concerning notice, CNMI regulations provide that employers must provide foreign workers with notice "in the standard form provided by the Department" and that employers "shall supply a translation" for foreign workers. NMIAC § 80-20.1-345(a).

<u>Working Hours and Pay</u>

96.    Plaintiffs regularly were required to work more than 40 hours per week.

97.    At times, like when working to renovate the DFS building, some Plaintiffs worked a night shift of more than 14 hours that started at 7:30pm and went into work the next morning.

98.    Plaintiffs' paystubs from RNV Defendants show them, including Plaintiff Malazarte, sometimes working more than 79 hours in a single week.

99.    Plaintiffs' paystubs from RNV Defendants show them, including Plaintiff De Leon, sometimes working more than 160 hours in a two-week pay period.

100.    Plaintiffs also did not get paid for all the hours that they worked.

101.    RNV Defendants kept records of the time worked by Plaintiffs.

102.    The time records maintained by RNV Defendants did not always record all the hours actually worked by Plaintiffs.

15

103.    For example, although truck drivers, such as Plaintiff De Leon, often reported to work at 6:00 a.m. and finished work at 7:00 p.m. each evening with only a one-hour lunch break (thus, performed a 12-hour work day), their time sheets and paystubs for those days would often only list 9 hours of work.

104.    Some Plaintiffs, on occasion, were simply not paid for all their documented hours with no explanation. For example, in the pay period between March 22 and April 4, 2020, Plaintiff Malazarte worked for 111.5 hours. After the deductions for "Cooperative," "Coop loan," and "EmpSavings" listed on the paystub, his net check should have amounted to $741.81. However, RNV Defendants only paid him $621.56 for that pay period.



*Figure 3: Giovan Malazarte's paystub for the March 22, 2024 - April 4, 2020 pay period*

105.    Although Plaintiffs were sometimes asked to work on holidays, they often did not receive 200% of their hourly wage. For example, Plaintiff Armia worked for 9 hours on January 2, 2023, but did not receive additional overtime for those hours.

<u>Work on FEMA Projects</u>

106.    RNV Defendants were awarded FEMA contracts with a value of at least $88 million.

16

107.    Plaintiffs performed at least part of their work on projects pursuant to these FEMA contracts. For instance, after Super Typhoon Yutu, RNV Defendants received contracts to repair private homes and Plaintiffs worked on these projects.

108.    Several of the Plaintiffs obtained a letter from FEMA Contracting Officer Representatives Deborah Flores and Clayton Ball attesting to the fact that they had performed work on FEMA-funded projects following Super Typhoon Yutu.

109.    The FEMA contracts required that Plaintiffs and other employees be paid a higher wage for work on those projects than they were previously earning.

110.    RNV Defendants, including Villacrusis personally, promised certain Plaintiffs that when they worked on FEMA projects they would receive a higher hourly wage.

111.    After commencing work on the FEMA projects, Plaintiffs Armia and De Leon received an initial paycheck based on the higher hourly wage that they were promised. However, after receiving these paychecks, RNV Defendants made Plaintiffs return these higher paychecks and instead issued a paycheck based on their lower hourly rate of pay.

112.    On information and belief, the higher paychecks were issued so that RNV Defendants could provide FEMA and/or other auditors with paychecks showing this higher rate.

113.    Thus, Plaintiffs did not receive either the regular wage or overtime wage to which they were entitled for working on these FEMA projects.

<u>Illegal Deductions</u>

114.    Throughout Plaintiffs' employment, RNV Defendants regularly made deductions from Plaintiffs' wages.

115.    These deductions appeared on Plaintiffs' paystubs as "rental," "coop," "advances," "other," or other line items.

116.    RNV Defendants generally did not provide a written explanation for these deductions, nor did they obtain Plaintiffs' written consent to take these deductions.

117.    RNV Defendants violated 3 CMC § 4931(g) by making deductions from Plaintiffs' wages that were not defined in regulations, approved in the employment contract, and itemized on the wage documentation provided to Plaintiffs.

118.    RNV Defendants made deductions from Plaintiffs' paychecks for housing costs despite promising to provide free housing.

119.    Some Plaintiffs, such as Malazarte, had housing deductions taken from their paychecks even though their contracts explicitly stated that they would receive "free suitable housing."

120.    RNV Defendants made numerous deductions that appeared as "other" on Plaintiffs' paychecks.

121.    Plaintiffs often did not know the reason for these "other" deductions and RNV Defendants would not provide clear explanations as to the purpose of the deductions.

122.    Many Plaintiffs had deductions from their paycheck for the "coop" despite not consenting to such deductions.

123.    RNV Defendants explained to Plaintiffs that the "coop" deduction was to fund a form of insurance program operated by RNV Defendants.

124.    Plaintiffs never received any written explanation of the terms of the coop program.

125.    On information and belief, RNV Defendants did not establish the coop program in accordance with applicable laws and regulations on employers loaning money to employees.

126.    Pursuant to this program, employees could make an application for a loan from RNV Defendants. After a loan was issued, both principal and interest would be automatically deducted from

18

the employee's future paychecks until the loan was repaid. On information and belief, the interest rate was higher than that charged by a commercial bank.

127.    RNV Defendants sometimes loaned money to Plaintiffs and then deducted the amounts from their paychecks. However, RNV Defendants would deduct more money than they had loaned to the employee.

128.    At the end of their contract or employment with RNV Defendants, Plaintiffs generally received back the money that was deducted and paid into the coop program with interest. However, the interest paid on this amount was low. On information and belief, the interest paid on the Plaintiffs' contributions was lower than the interest charged to workers who took loans.

<u>Living Conditions</u>

129.    The conditions at the barracks where Plaintiffs lived, and for which they were forced to pay, were overcrowded and unhygienic.

130.    The toilets in the barracks were rusting and unsanitary.



*Figure 5: Toilet in RNV Defendants' barracks*

19

131.    OSHA regulations require that worker housing must include: at least one stove for every ten people; hot water in the housing facility; and measures to prevent infestation by and/or harborage of animal or insect vectors or pests. 29 CFR 1910.142.

132.    The housing provided by RNV Defendants did not comply with the minimum standards set by OSHA.

133.    Plaintiffs slept in rooms that were approximately 8-feet by 12-feet with anywhere from four to seven RNV employees in one room.

134.    In the kitchen of the barracks, the cabinets were often filled with cockroaches.

135.    There were often rodents present in the barracks.

136.    There were often cats and dogs in the barracks, and there was excrement from these animals all over the floors of the barracks.



*Figure 6: Stray cat in kitchen of RNV Defendants' barracks*

137.    RNV Defendants did not provide any stoves. Instead, employees had to purchase their own hot plates.

138.    The barracks had no hot water.

20

139.   The showers near the barracks had no hot water.

140.   On information and belief, RNV Defendants did not arrange to have the inside of the barracks cleaned.

Unsafe Transportation

141.   RNV Defendants failed to provide safe transportation for Plaintiffs to and from the job site.

142.   Plaintiffs were generally required to sit in the back of a flatbed truck, where there were no seat belts.

143.   There were often 15 to 20 workers in the back of a single truck, and there were also tools and equipment in the back of the truck.

144.   In the event of a car accident, Plaintiffs in the back of a flatbed truck could have been seriously injured or killed.

145.   If it was windy and raining, Plaintiffs could be exposed to those conditions while riding in the back of the track for approximately 10 to 30 minutes each trip to or from the job site. Plaintiffs believe that this caused some of their coworkers to get sick.

146.   Plaintiff Malazarte paid for a taxi to take him to and from the job site each day because he believed that riding in the truck was dangerous, which cost him approximately $8 per workday.

Failure to Pay Medical Expenses

147.   Although RNV Defendants had promised Plaintiffs free medical care, Plaintiffs were often forced to pay their own medical expenses when they were sick or injured.

148.   In the event that RNV Defendants paid for Plaintiffs' medical costs, this money was then deducted from Plaintiffs' future paychecks.

21

149.    On one occasion, Plaintiff Alcoseba became sick, was unable to work for three weeks, and asked Jane Rueda for medicine, which she refused to provide. Jane Rueda told Alcoseba that he had to find a way to make money to pay for his medicine, even though at the time, Alcoseba was unable to walk.

150.    RNV Defendants eventually agreed to loan money to Plaintiff Alcoseba to pay for medicine; however, this money was later deducted from his paycheck.

151.    In March 2023, Plaintiff Fraginal was injured in a car accident while driving a vehicle for RNV Defendants. The CNMI Police Department Traffic Crash Report indicates that the accident resulted in "disabling damage" to the vehicle.

152.    Plaintiff Fraginal's employment contract states that RNV Defendants would provide "free emergency medical and dental services and facilities including medicine."

153.    The doctor who examined Plaintiff Fraginal on the day of the accident diagnosed him with neck and shoulder strain, low back pain/strain, and musculoskeletal pain.

154.    The following day, Plaintiff Fraginal's pain worsened significantly, and he was unable to get out of bed.

155.    Plaintiff Fraginal contacted Villacrusis to ask if he could seek out further medical treatment, but Villacrusis refused to support Fraginal in seeking out further treatment.

156.    Plaintiff Fraginal's back pain became so severe that he was unable to move for approximately one month. RNV Defendants still refused to provide Fraginal with financial support for medical care.

157.    Plaintiff Fraginal's employment contract states that RNV Defendants would provide "free transportation to the point origin … if the employee is unable to continue to work due to work connected or work aggravated injury or illness."

158.    Plaintiff Fraginal asked if RNV Defendants would provide him with a plane ticket to the Philippines so that he could seek out his own treatment there. However, RNV Defendants refused to do so.

159.    Eventually, Plaintiff Fraginal returned to the Philippines to seek out medical treatment. He was forced to pay himself for his flight and all medical expenses in the Philippines.

160.    In the Philippines, Plaintiff Fraginal was diagnosed with spinal nerve damage and was told he needed to undergo physical therapy. The diagnostic tests in the Philippines cost Fraginal approximately 100,000 Philippine pesos. Fraginal also paid approximately 7,500 Philippine pesos for five physical therapy sessions.

161.    Since the accident, Fraginal has begun to experience headaches, and he believes that he may have also suffered neurological damage.

<u>Threats, Intimidation, and Retaliation</u>

162.    RNV Defendants routinely sought to intimidate, threaten, and retaliate against Plaintiffs for seeking to assert their labor rights.

163.    Plaintiffs and other employees inquired or complained about the deductions from their wages, including those that seemed contradictory to the promises in their contracts, to RNV's managers, such as Jane Rueda.

164.    In response, the managers threatened Plaintiffs and other employees that if they complained, RNV Defendants would not renew their contracts and Plaintiffs would need to pay for their own flight back to the Philippines.

165.    Jane Rueda also regularly dismissed Plaintiffs' complaints by stating that "nothing is free in the U.S."

166.    On one occasion, when Plaintiff Valles inquired about increases to RNV Defendants' rental fees, Jane Rueda dismissed him by stating that nothing is free.

167.    On at least one occasion, Jane Rueda told Plaintiff Pineda that he should be thankful that he reached U.S. soil.

168.    On at least one occasion, when Plaintiff Fraginal complained to Jane Rueda about deductions to his paycheck, she told him that any businessman has the right to deduct and that's how business is done.

169.    In or around September 2022, RNV Defendants issued a "Memo" to Plaintiffs and other employees, signed by Villacrusis as "General Manager," stating that if an employee does not fulfill his obligations under the employment contract, then "the employee has to shoulder the cost incurred for their papers' processing" and that "the company reserves the right to file for any legal claim/damages." **Exhibit D.** The Memo further states that RNV Defendants will only pay the airfare costs for employees who complete their full contracts—implying those who are terminated or leave early will need to pay for their own airfare back to the Philippines.

170.    Plaintiffs are aware of at least one worker, Jessie, who RNV Defendants retaliated against when they learned that he planned to file a complaint with the labor department. RNV Defendants did not renew his contract and he had to pay for his own ticket back home. Plaintiffs interpreted this incident to mean that they would suffer the same fate if they filed such a complaint, which chilled and intimidated them from doing so.

171.    In a staff meeting in or around July 2023, Villacrusis sought to further deter Plaintiffs from filing complaints with the labor authorities by stating that he would even drive them in his own car if they wanted to complain. Plaintiffs understood this as an effort by Villacrusis to intimidate them

by showing his close connections with the authorities and that their complaints would be futile. Jane Rueda and Michelle Rueda also participated in the staff meeting.

172.    In a meeting regarding an upcoming government inspection in or around 2022, Nilo Naval, a supervisor with RNV Defendants, instructed Plaintiff Pineda to tell anyone who asked that he was not being charged a rental fee for his accommodations in Saipan.

173.    When RNV Defendants were being investigated by federal immigration authorities, RNV Defendants coached Plaintiffs Armia and De Leon to lie to the authorities about the terms and conditions of their employment.

174.    Defendants Jane Rueda and Michelle Rueda instructed Plaintiffs Armia and De Leon to tell U.S. immigration authorities that they had free housing and a food allowance, and that the company would purchase flights home should either the employees or the RNV Defendants choose not to renew their employment contracts. Michelle Rueda also instructed Armia and De Leon to tell the authorities that Villacrusis was not the owner of Coreplus.

175.    Thereafter, Plaintiffs Armia and De Leon were interviewed by U.S. immigration authorities. During the meeting, the immigration authorities requested that De Leon provide them with a paystub from RNV Defendants, and De Leon complied. The paystub showed that RNV Defendants had deducted money from De Leon's paycheck for housing.

176.    Approximately two days after Plaintiffs Armia and De Leon met with the immigration authorities, RNV Defendants terminated the employment of Armia and De Leon in retaliation for providing truthful information to the authorities, including by providing the authorities with an actual paystub.

177.    During their termination meeting, Villacrusis, Jane Rueda, and Michelle Rueda told Plaintiffs Armia and De Leon that they needed to leave the United States because the U.S. immigration

authorities had filed charges against Armia and De Leon. At the meeting, Villacrusis said that RNV Defendants had a letter from U.S. immigration authorities, and attempted to force Armia and De Leon to sign it without explaining what the letter said or why the Plaintiffs' signatures were required.

178.   In June 2023, several of the Plaintiffs filed a complaint with the CNMI Department of Labor about RNV Defendants' illegal labor practices, such as the illegal deductions.

179.   After RNV Defendants learned about the complaint to the CNMI Department of Labor, they offered a $2,000 bounty for whoever turned over information about the location of Plaintiff Armia so that RNV Defendants could have him deported.

180.   Villacrusis asked employees at his companies, including Plaintiff Malazarte, if they were part of the complaint to the CNMI Department of Labor, or if they knew who was involved in making the complaint.

181.   Villacrusis directed managers of his companies to ask workers, including Plaintiff Alcoseba, if they were part of the complaint or knew who was involved in making the complaint.

182.   Plaintiffs filed the lawsuit in the instant matter on September 22, 2023.

183.   After the lawsuit was filed, RNV Defendants continued with their intimidation and retaliation against the workers who were part of the lawsuit or who contemplated joining the lawsuit.

184.   RNV Defendants continued to threaten to have any workers who joined the lawsuit deported from the CNMI.

185.   Villacrusis informed the uncle of Plaintiff Pineda that if Pineda cooperated with the authorities investigating RNV, then Villacrusis would have him deported.

186.   Since filing this lawsuit, both Villacrusis' friends and RNV Defendants employees have also contacted Plaintiff Pineda to try to convince him not to participate in the case.

187.    On one occasion, Julius Fabiana, an employee of RNV Defendants, told Plaintiff Pineda that if he participated in the case, then he would be deported.

188.    In or around February or March 2024, a neighbor told Plaintiff Pineda that Villacrusis had asked the neighbor to tell Pineda that if he participated in the case, then he would be deported.

189.    Plaintiff Tortor overheard a supervisor for the RNV Defendants stating that if the Plaintiffs continued the lawsuit, RNV Defendants would have the Plaintiffs deported.

190.    RNV Defendants also blacklisted or attempted to blacklist Plaintiffs from working in Saipan. Several Plaintiffs learned that RNV Defendants had contacted other employers in Saipan and instructed that they should not be hired. For instance, one Plaintiff was told by a friend at Isla Builders that Villacrusis instructed that the employee should not be hired.

191.    Plaintiffs have received informal offers of employment in Saipan, only to have those offers subsequently rescinded due to RNV Defendants' blacklisting efforts.

192.    After Plaintiff Valles was terminated from his employment with RNV Defendants, Villacrusis contacted other employers to try to prevent them from hiring Valles.

193.    Individuals who were considering joining the lawsuit were told that RNV Defendants would have them deported if they did so, which caused them not to pursue joining the lawsuit.

194.    At least four former employees of RNV Defendants expressed interest in joining the lawsuit, but then decided not to proceed after the threats of deportation were made.

195.    On or around July 25, 2024, several Plaintiffs filed a formal complaint with the U.S. Department of Labor against RNV Defendants based on the retaliation against them.

196.    On information and belief, the U.S. Department of Labor contacted RNV Defendants about the allegations soon thereafter.

27

197.    After the U.S. Department of Labor complaint was filed, RNV Defendants' intimidation and retaliation against Plaintiffs persisted, and in some cases, intensified.

198.    RNV Defendants began to engage in surveillance of some Plaintiffs both to intimidate them and in an effort to have them deported.

199.    In September 2024, Plaintiff Malazarte noticed that he was being subjected to surveillance by an employee of Coreplus. On September 12, 2024, Plaintiff Malazarte went to the store and saw a Coreplus car parked outside. Defendant Resurrection, an employee of Coreplus, was standing outside the car chatting with someone on the phone. The next day, on September 13, 2024, Plaintiff Malazarte was on a video call with a colleague and noticed Defendant Resurrection in the background of the call. On Saturday, September 14, 2024, Mr. Malazarte went to fix a leak in a rental apartment, and saw the Coreplus car parked across the street from the apartment building. He went to Ace Hardware that afternoon to pick up some supplies, and again saw the Coreplus car and Defendant Resurrection there too.

200.    Around this same time, Plaintiff Malazarte was informed that he had been reported to the federal authorities about working in Saipan without a proper visa.

201.    On information and belief, RNV Defendants have been contacting federal authorities to report that other Plaintiffs are working in Saipan without a proper visa.

202.    On September 19, 2024, around 5:30pm, Defendant Resurrection visited Plaintiff Alcoseba's residence and asked Alcoseba whether he knew an individual by the name of Dante. Alcoseba does not know anyone by that name. Alcoseba believes that Defendant Resurrection's true purpose in coming to his residence was to conduct surveillance and intimidate him.

*Figure 8: Defendant Resurrection's car in front of Plaintiff Alcoseba's residence*

203.    In or around July 2024, Defendant Resurrection came to Plaintiff Armia's residence on two occasions and tried to convince him not to continue with the lawsuit. Defendant Resurrection told Armia that if the lawsuit continued, Plaintiffs would not win, and that if Plaintiffs withdrew the lawsuit, nothing would happen to them.

204.    Plaintiff Armia no longer feels comfortable leaving his home because when he goes outside, he constantly fears being monitored or approached by RNV Defendants and Defendant Resurrection.

205.    In or around September 2024, Plaintiff De Leon also began observing Defendant Resurrection following him in a Coreplus car.

206.    In October 2024, Plaintiff Armia was offered work on a project near the airport for a company at which Villacrusis' relative is a manager. Plaintiff Armia was then informed that his start date at the company would be delayed.

207.    On information and belief, other employees who had been offered work at the same time as Plaintiff Armia were permitted to start.

208.    On information and belief, Villacrusis, directly or through his agents, contacted the employer and directed that Plaintiff Armia not be permitted to work there.

<u>Individual and Corporate Liability</u>

209.    Villacrusis exercises control over Corporate Defendants.

210.    Villacrusis appointed Jane Rueda and Michelle Rueda as managers and Villacrusis supervises their work.

211.    Villacrusis had the authority to hire and fire Plaintiffs and other employees.

212.    Villacrusis personally signed Plaintiffs' employment contracts.

213.    Villacrusis personally participated in the termination of Plaintiff Armia and Plaintiff De Leon.

214.    Villacrusis would speak on behalf of RNV Defendants at meetings pertaining to human resources issues, such as complaints to the labor authorities.

215.    Villacrusis had the authority to set Plaintiffs' wages.

216.    Villacrusis personally served as the petitioner on one of Plaintiff Yangyang's CW-1 applications, according to the Notice of Approval dated January 21, 2021.

217.    Jane Rueda oversaw the human resources functions for all Corporate Defendants and personally performed human resources work involving Plaintiffs and other employees.

218.    As part of this work, Jane Rueda regularly interacted with Plaintiffs concerning their paychecks and questions that they had.

219.    On information and belief, Jane Rueda would help to facilitate employee meetings pertaining to employee onboarding and other human resources matters, and would speak on behalf of RNV Defendants at those meetings.

220.    Jane Rueda personally participated in the termination of Plaintiff Armia and Plaintiff De Leon.

221.    On information and belief, Jane Rueda had the authority to oversee and approve Plaintiffs' CW-1 visa renewals. When employees complained to Jane Rueda about contract violations or illegal paycheck deductions, she would threaten not to renew their CW-1 visas.

222.    Jane Rueda would personally oversee Plaintiffs' contract renewals with RNV Defendants and is the person who solicited the employees' signatures.

223.    When workers complained to Villacrusis about their employment, he often would tell them to convey the issues to Jane Rueda.

224.    Michelle Rueda oversaw all accounting functions for Corporate Defendants.

225.    Employees of RNV Defendants would meet with Michelle Rueda as part of their onboarding with RNV Defendants.

226.    Michelle Rueda personally requested that Plaintiffs Armia and De Leon lie to U.S. immigration authorities.

227.    Michelle Rueda personally participated in the termination of Plaintiffs Armia and De Leon.

228.    RNV Defendants are vicariously liable under the doctrine of *respondeat superior* for the causes of action pleaded below that arise from acts carried out by the employees of RNV Defendants.

229.    RNV Defendants shared a common business purpose of maximizing profit for Villacrusis and his relatives.

230.    RNV Defendants were all under the common control of Villacrusis and his family members.

31

231.    RNV Defendants were operated as a unified operation, including by sharing managers and moving employees between them.

232.    RNV Defendants commingled their resources in the operation of the business.

233.    For example, employees working for all the various Corporate Defendants resided in the same housing barracks.

234.    RNV Defendants ignored corporate formalities between the various Corporate Defendants because they had the same ultimate owner.

235.    For instance, while workers were technically employed and paid by one of the Corporate Defendants, they would still do work on behalf of or that benefitted other Corporate Defendants.

236.    For example, Plaintiff Armia performed work for both RJCL and Coreplus, although his time sheets all came from RNV Construction.

237.    Even when the company issuing their paycheck changed, Plaintiffs always understood themselves to be working for and employees of RNV Construction.

238.    On information and belief, the various Corporate Defendants shared a common address and office.

239.    The RNV Construction website (https://www.rnvconstruction.com) explicitly lists Villaroyal Pawnshop (Wandervilla) and Best Deal General Merchandise (Homesmart) as "Affiliates."

240.    All acts, omissions, and failures to act alleged herein were done by and attributable to each and all of the RNV Defendants, each acting as successor, agent, employer, joint employer, integrated enterprise, contractor, and/or as the alter egos of one another, and/or under the direction and control of the other.

241.    Said acts, omissions and failures to act were within the scope of said agency and/or scope of employment, and each of the RNV Defendants participated in, approved, and/or ratified the unlawful acts and omissions by the other of the RNV Defendants complained of herein.

### FLSA Coverage

242.    At all relevant times, Plaintiffs were employees of and were suffered to work by their respective employers within the meaning of §203(e)(l) of the FLSA.

243.    At all relevant times, Plaintiffs were employed by RNV Defendants within the meaning of §203(g) of the FLSA.

244.    Villacrusis was the employer of Plaintiffs under the FLSA because he had the authority to hire and fire Plaintiffs, determine their daily work schedule of assignments, and set their rate of pay.

245.    Jane Rueda was the employer of Plaintiffs under the FLSA because she shared authority to hire and fire Plaintiffs, set wages, handle employee grievances, and address other terms and conditions of their employment.

246.    Michelle Rueda was the employer of Plaintiffs under the FLSA because she shared authority to set employee wages, hire and fire employees, and address other terms and conditions of their employment.

247.    RNV Defendants, directly or indirectly, as set forth in the many allegations above, hired and suffered Plaintiffs to work; controlled their work schedules and conditions of employment; and determined the rate and payment of wages.

248.    At all relevant times, RNV Defendants were engaged in an enterprise within the meaning of §203(r)(1) of the FLSA, jointly and severally.

249.    At all relevant times, RNV Defendants were the employers of Plaintiffs as defined under §203(d) of the FLSA.

33

250.    At all relevant times, RNV Defendants were an enterprise engaged in commerce or in the production of goods for commerce within the meaning of §203(s)(l) of the FLSA.

251.    The employees of RNV Defendants routinely handled and worked on construction materials that were imported to Saipan from other States and other countries in the course of performing their construction work. For instance, RNV Defendants used satin grab bars that were imported from California and used shower bars from a company headquartered in Ohio. Plaintiffs also used materials from China and the Philippines in performing their work for RNV Defendants.

252.    Upon information and belief, RNV Defendants generated over $500,000 in gross revenue per year.

253.    For example, one of the contracts between RNV Defendants and FEMA to construct 20 homes was for more than $6.1 million, including over $1 million in profit for the RNV Defendants. Another contract was for $9.9 million. One contract for work on Tinian was for over $800,000.

## FIRST CAUSE OF ACTION
### (TVPRA Violations)

254.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

255.    The TVPRA makes it a criminal offense to knowingly provide or obtain labor, or attempt or conspire to provide or obtain labor (1) by means of force or threats of force; (2) by means of serious harm or threats of serious harm; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern of behavior intended to cause the person to believe they would suffer serious harm if they did not perform that labor. 18 U.S.C § 1589(a).

256.    In addition, any person who "knowingly benefits" from participating in a venture that has engaged in providing or obtaining labor services by any of the aforementioned means is similarly liable. 18 U.S.C § 1589(b).

257.    The TVPRA provides that victims of these aforementioned offenses may bring a civil action in federal district court against the perpetrators of the forced labor scheme, or anyone who knowingly benefits, or attempts or conspires to benefit, or receives anything of value from the scheme. 18 U.S.C § 1595.

258.    RNV Defendants defrauded Plaintiffs by promising certain terms and conditions of employment in order to induce them to travel from the Philippines to work for them in Saipan, but then subjected them to inferior employment terms after Plaintiffs arrived in Saipan.

259.    RNV Defendants engaged in a pattern of threats and coercive tactics to make Plaintiffs believe that they had no choice but to continue working for RNV Defendants despite the exploitative conditions, including underpaying them for their long hours, making illegal deductions from their wages, and subjecting them to inhumane treatment, such as by providing substandard housing.

260.    When Plaintiffs complained about or questioned their mistreatment, RNV Defendants threatened to cause them financial harm by (illegally) not renewing their contract or making them pay for their own return to the Philippines.

261.    RNV Defendants also threatened that if Plaintiffs left their job, then they would need to pay their own way to the Philippines, repay certain expenses, and potentially face a lawsuit against them by RNV Defendants.

262.    Plaintiffs reasonably believed these threats because RNV Defendants had previously carried out such retaliation against one of their coworkers.

263.    RNV Defendants made Plaintiffs believe that complaining to the labor authorities about their situation would be futile, which made Plaintiffs feel trapped and helpless.

264.    RNV Defendants instructed Plaintiffs to lie to federal agents, which made them feel that complaining to the authorities was hopeless.

265.    RNV Defendants made threats to deport employees who complained about their mistreatment, which also constitutes an abuse of the legal process. 18 U.S.C § 1589(a)(3).

266.    RNV Defendants made threats to file a lawsuit against employees who did not fulfill their obligations under the employment contract and seek damages, including repayment of the costs incurred by RNV Defendants, which also constitutes an abuse of the legal process. 18 U.S.C § 1589(a)(3).

267.    Villacrusis was personally involved in the illegal wage and hour practices, intimidating Plaintiffs about complaining to labor authorities, and threatening to have Plaintiffs deported.

268.    RNV Defendants benefited from their forced labor scheme by having Plaintiffs continue to perform labor on their behalf, and benefitted even further by not providing the compensation or other economic benefits to which Plaintiffs were entitled.

269.    RNV Defendants benefitted from having a workforce that was intimidated from complaining about their mistreatment due to fear of being deported from the CNMI.

270.    RNV Defendants benefitted from having a workforce of employees on CW visas who had limited or no other options of employers for whom they could work.

271.    RNV Defendants benefited from the forced labor by being able to bid for and complete the FEMA contracts, which resulted in millions of dollars for RNV Defendants.

272.    RNV Defendants also recruited Plaintiffs from the Philippines, transported them to Saipan, and harbored them in the CNMI for the purpose of forced labor. 18 U.S.C § 1590(a).

273.    RNV Defendants also attempted to obstruct or interfere with the enforcement of the prohibition on recruiting, transporting, or harboring employees for the purpose of forced labor by, *inter alia*, instructing Plaintiffs to lie to federal authorities about their treatment. 18 U.S.C § 1590(b).

274.    Due to these TVPRA violations, Plaintiffs are entitled to damages for all economic harm and emotional distress suffered as a result of the forced labor scheme, punitive damages, and attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### (FLSA Violations)

275.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

276.    The FLSA requires that each employee be paid at least the applicable minimum wage.

277.    The FLSA requires that employees be paid overtime wages in the amount of one and one-half times their applicable regular pay rate for each and all the hours worked in excess of forty (40) hours in each workweek.

278.    The FLSA prohibits deductions from wages for expenses that benefit the employer, such as travel costs, immigration expenses, recruitment fees, and visas.

279.    The FLSA requires that an employee's compensation be paid "free and clear" and prohibits any kickback to the employer. 29 C.F.R. § 531.35.

280.    RNV Defendants violated the FLSA by making illegal deductions from Plaintiffs' compensation and failing to pay their compensation "free and clear."

281.    RNV Defendants violated the FLSA's minimum wage requirements by failing to pay Plaintiffs for all hours worked as well as by making improper deductions from their wages.

282.    RNV Defendants violated the FLSA's overtime requirements by failing to compensate Plaintiffs for all hours worked, making improper deductions from their wages, and not calculating their overtime based on the appropriate prevailing wage.

283.    RNV Defendants violated the "free and clear" requirements of the FLSA by making improper, non-consensual deductions from Plaintiffs' wages.

37

284.   RNV Defendants violated the "free and clear" requirements of the FLSA by issuing paychecks to Plaintiffs and then demanding that they be returned.

285.   RNV Defendants' violations of the FLSA were willful.

286.   RNV Defendants are thus liable and obligated to compensate Plaintiffs for these illegal deductions, minimum wage violations, and overtime violations, plus an equal amount as liquidated damages pursuant to § 216(b) of the FLSA.

287.   Plaintiffs are likewise entitled to an award of costs of this action and reasonable attorney's fees, as well as prejudgment interest, pursuant to §216(b) of the FLSA.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

288.   Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

289.   Plaintiffs and RNV Defendants executed employment contracts at the start of Plaintiffs' employment, which were renewed annually.

290.   RNV Defendants breached their contracts with Plaintiffs because they, *inter alia*, made deductions from their wages other than for CNMI taxes and Social Security, made them work more than 40 hours per week, failed to pay the promised overtime premiums, and failed to provide free food, housing, and medical care.

291.   RNV Defendants breached their contracts with Plaintiffs Armia and De Leon because they terminated them without providing 10 days advance written notice.

292.   RNV Defendants breached their contracts with Plaintiffs Armia and De Leon because they terminated them without engaging in a good faith attempt to settle any dispute with the Chief of Labor or his designee.

293.    The aforementioned actions by RNV Defendants constituted material breaches of the contracts with Plaintiffs.

294.    Plaintiffs suffered significant economic, emotional, reputational, and other damages as a result of RNV Defendants' breaches.

## FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

295.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

296.    The Restatement (Second) of Contracts, § 201, provides that every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

297.    RNV Defendants breached their implied covenant of good faith and fair dealing by violating standards of decency, fairness, or reasonableness in implementing their contracts with Plaintiffs.

298.    RNV Defendants' failure to record Plaintiffs' hours, failure to compensate all hours, promising a higher wage and then not paying it, making improper deductions from wages, not paying for medical costs or return travel to the Philippines, and threatening and intimidating Plaintiffs to accept these inferior terms of employment constitute bad faith and a lack of fair dealing.

299.    RNV Defendants' conduct with regards to Plaintiffs' employment that violates federal or CNMI laws, regulations, rules, or policies constitutes bad faith and a lack of fair dealing.

300.    Plaintiffs were injured as a result of RNV Defendants' breach of the implied covenant of good faith and fair dealing and are entitled to damages.

## FIFTH CAUSE OF ACTION
### (Promissory Estoppel)

301.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

302.    The Restatement (Second) of Contracts provides that a cause of action exists for promissory estoppel where: (1) the defendant intends to induce the plaintiff to act in reliance on his or her promise; (2) the plaintiff does, in fact, act in reliance of the promise; and (3) an injustice results.

303.    RNV Defendants made numerous promises to Plaintiffs to induce them to work for RNV Defendants, including but not limited to a specified wage, overtime premiums, no deductions other than for CNMI taxes and Social Security, free food, free housing, free medical care, that the employer would cover all travel to and from the Philippines as well as related immigration and visa costs, and that the employer would comply with all applicable laws and regulations.

304.    RNV Defendants intended Plaintiffs to rely upon these promises in deciding to come to the CNMI and work for RNV Defendants.

305.    Relying upon the above promises by RNV Defendants, Plaintiffs agreed to travel to the CNMI and work long hours for RNV Defendants.

306.    RNV Defendants also promised Plaintiffs that they would be paid a higher wage for their work on FEMA projects and intended that Plaintiffs would rely on these promises by providing their labor on these FEMA projects.

307.    RNV Defendants knew that Plaintiffs actually did rely on these promises.

308.    RNV Defendants did not fulfill their promises to Plaintiffs in terms of wages, deductions, free food, housing, and medical care, payment for flying back to the Philippines, or compliance with applicable laws.

309.    Plaintiffs have been injured based on their reliance upon RNV Defendants' promises in numerous ways, including suffering economic harm.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

310.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

311.    In the CNMI, a cause of action exists for unjust enrichment where: (1) the defendant was enriched; (2) the enrichment was at the plaintiff's expense; and (3) equity and good conscience militate against permitting the defendant to retain what the plaintiff seeks to recover.

312.    RNV Defendants were enriched by failing to properly compensate Plaintiffs, making improper deductions from Plaintiffs' wages, and failing to provide the benefits promised to Plaintiffs upon hiring.

313.    RNV Defendants were enriched by engaging in employment practices with regards to Plaintiffs that violated federal or CNMI laws, regulations, rules, or policies.

314.    These benefits to RNV Defendants came at the expense of Plaintiffs.

315.    Equity and good conscience militate against RNV Defendants retaining the money or other benefits in these circumstances.

316.    Plaintiffs are therefore entitled to recover damages from RNV Defendants.

## SEVENTH CAUSE OF ACTION
### (Fraudulent Misrepresentation)

317.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

318.    The Restatement (Second) of Torts recognizes a cause of action for fraudulent misrepresentation where a person fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it.

319.    RNV Defendants intentionally and fraudulently misrepresented their intention of providing Plaintiffs with high wages, free housing, adequate housing, free food, free medical care, and free transportation back to the Philippines.

41

320.    RNV Defendants made these fraudulent misrepresentations to induce Plaintiffs leave the Philippines and come to Saipan to work for RNV Defendants.

321.    RNV Defendants intentionally and fraudulently misrepresented that they could deport Plaintiffs back to the Philippines and make Plaintiffs pay the costs because they inquired or complained about their compensation.

322.    RNV Defendants made these fraudulent misrepresentations to induce Plaintiffs to continue working for RNV Defendants despite the unfair treatment.

323.    Plaintiffs justifiably relied on RNV Defendants' representations when they left the Philippines for Saipan and performed many hours of work for RNV Defendants.

## EIGHTH CAUSE OF ACTION
### (Negligent Misrepresentation)

324.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

325.    The Restatement (Second) of Torts recognizes a cause of action for negligent misrepresentation where a person supplies false information for the guidance of others in their business transactions.

326.    In the course of the employment arrangement between RNV Defendants and Plaintiffs, RNV Defendants supplied Plaintiffs with false information, including regarding Plaintiffs' employment benefits and their rights in the United States, to induce Plaintiffs to start work and continue work for RNV Defendants.

327.    For example, RNV Defendants provided false information about wage rates, free housing, adequate housing, free food, free medical care, and free transportation back to the Philippines.

328.    RNV Defendants failed to exercise reasonable care in conveying the above information to Plaintiffs.

329.    Plaintiffs justifiably relied on information conveyed to them by RNV Defendants as newcomers to the United States with limited English language competency.

## NINTH CAUSE OF ACTION
### (Termination in Violation of Public Policy)

330.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

331.    The Restatement of Employment Law recognizes the tort of wrongful discharge in violation of public policy.

332.    Plaintiffs Armia and De Leon inquired and/or complained about RNV Defendants' practices of failing to pay appropriate compensation, including by making deductions from their paychecks that they believed were improper or illegal.

333.    Plaintiffs Armia and De Leon truthfully answered the questions of the federal immigration authorities about the terms and conditions of their employment and provided documents provided to them by the employer.

334.    RNV Defendants terminated Plaintiffs Armia and De Leon for inquiring about the compensation and deduction practices of their employers, and because they provided truthful information to federal authorities investigating RNV Defendants' compliance with various labor and immigration laws designed to protect workers.

335.    The CW Regulations prohibit employers from discharging or in any manner discriminating against a person who has participated in a proceeding or asserted a right or protection afforded by federal or CNMI laws or regulations.

336.    CNMI law makes it a misdemeanor for an employer to discharge or discriminate against any employee because the employee has made a complaint to the employer or to any other

person that the employee has not been properly paid wages, or has testified or is about to testify in a proceeding. 4 CMC § 9242.

337.    Numerous other federal statutes and regulations prohibit employers from retaliating against workers who provide truthful information to government authorities.

338.    RNV Defendants' termination of Plaintiffs Armia and De Leon undermines the important public policy that workers be able to assert their rights and/or provide information to government authorities without facing retaliation.

## TENTH CAUSE OF ACTION
### (Retaliation in Violation of the FLSA)

339.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

340.    Under the FLSA, it is unlawful for any person to retaliate against employees who assert their rights under that law. 29 U.S.C. § 215(a)(3).

341.    Plaintiffs engaged in protected activity by inquiring and/or complaining to RNV Defendants and to the CNMI Department of Labor about the wage and hour violations by RNV Defendants.

342.    Plaintiffs engaged in protected activity by filing this lawsuit concerning RNV Defendants wage and hour violations.

343.    Plaintiffs engaged in protected activity by sending a demand letter to RNV Defendants stating their intention to add new plaintiffs and new claims in this lawsuit.

344.    Plaintiffs engaged in protected activity by inquiring and/or complaining to the U.S. Department of Labor about RNV Defendants' retaliation against them.

345.    In retaliation for engaging in the aforementioned protected activity, RNV Defendants discriminated against Plaintiffs by, *inter alia*, terminating their employment, threatening to have them

44

deported, blacklisting them, conducting surveillance, attempting to have them deported, and threatening to cause them problems if they did not withdraw from the lawsuit.

346.    In retaliation for engaging in the aforementioned protected activity, Defendant Resurrection discriminated against Plaintiffs by surveilling them and harassing them, with the purpose of causing Plaintiffs fear and distress, and in support of RNV Defendants efforts to convince Plaintiffs to withdraw the lawsuit.

347.    As a result of RNV Defendants' and Defendant Resurrection's illegal retaliation, Plaintiffs are entitled to recover compensation for lost wages, emotional distress, liquidated damages, attorneys' fees and costs, and prejudgment interest. 29 U.S.C. § 216(b).

## ELEVENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

348.    Plaintiff re-alleges and incorporates all allegations in all preceding paragraphs.

349.    The Restatement (Third) of Torts recognizes a cause of action for the intentional infliction of emotional distress where: (1) the conduct complained of was outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.

350.    RNV Defendants intentionally or recklessly inflicted emotional distress upon Plaintiffs by, *inter alia*, threatening to have them deported, putting a bounty on their heads, having them blacklisted in the CNMI, subjecting them to surveillance, and reporting to federal authorities that they were working without proper visas.

351.    RNV Defendants' intention was that their actions would cause such severe emotional distress that Plaintiffs would be compelled to withdraw their claims and/or lawsuit.

352.    RNV Defendants' conduct towards Plaintiffs was outrageous.

45

353.    RNV Defendants' conduct was a clear and direct violation of the CW Regulations and other federal laws that prohibit such retaliation against workers who assert their rights.

354.    Defendant Resurrection's intentionally or recklessly inflicted emotional distress upon Plaintiffs by, *inter alia*, surveilling their whereabouts on behalf of RNV Defendants and intimidating Plaintiffs in public and at their residences.

355.    Defendant Resurrection's conduct towards Plaintiffs was outrageous.

356.    Plaintiffs have suffered severe emotional distress as a result of RNV Defendants' and Defendant Resurrection's outrageous actions against them.

## DEMAND FOR JURY TRIAL

357.    Plaintiffs demand a jury trial on all issues triable by a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

358.    Wherefore, Plaintiffs demand that a judgment be entered in her favor and that the Court order and award Plaintiffs the following relief against RNV Defendants and Defendant Resurrection:

a.   A declaratory judgment that the actions, conduct, and practices of RNV Defendants and Defendant Resurrection complained of herein violates federal and/or CNMI law;

b.   An award of all compensatory damages in an amount to be determined at trial;

c.   An award of liquidated damages permitted by law;

d.   An award of punitive damages in an amount to be determined at trial;

e.   Pre-judgment interest on all amounts due;

f.   An award of Plaintiff's reasonable attorneys' fees and costs;

g.   Injunctive relief enjoining RNV Defendants and Defendant Resurrection from engaging in any further discrimination or retaliation against Plaintiffs; and

h.  Such other and further relief as the Court may deem just and proper.

Date: October 10, 2024

Respectfully submitted,

/s/ Aaron Halegua
Aaron Halegua
Colin M. Thompson

**THOMPSON LAW, LLC**
Colin M. Thompson
J.E. Tenorio Bldg.
PMB 917, Box 10001
Saipan, MP 96950
(670) 233-0777
cmtlaw@live.com
CNMI Bar No. F0221

**AARON HALEGUA, PLLC**
Aaron Halegua
524 Broadway, 11th Floor
New York, NY 10012
(646) 854-9061
ah@aaronhalegua.com
*Admitted Pro Hac Vice*

***Attorneys for Plaintiffs***

47

Exhibit A

### EMPLOYMENT CONTRACT

This employment contract is entered into by and between **RJCL CORPORATION dba**

**RNV CONSTRUCTION** hereinafter referred to as the Employer, and

**PROSPERO ALERTA ARMIA** of **NAGA CITY**

hereinafter referred to as the Employee.

The Employer hereby employs the Employee and the Employee hereby accepts to be employed by the Employer to serve and perform the duties required of him/her in the job category provided below:

**A.  DUTIES AND RESPONSIBILITIES:** The parties hereto agree that the Employee shall be employed only in the job category of **CARPENTER**

and shall perform the following duties and responsibilities including training of resident workers:

• Clean work areas, machines, or equipment, to maintain a clean and safe job site.
• Fasten timbers or lumber with glue, screws, pegs, or nails and install hardware.
• Perform tie spacing layout and measure, mark, drill or cut.
• Select tools, equipment, or materials from storage and transport items to work site:
• Drill holes in timbers or lumber.

**B.  TERM:** The term of this Contract shall be for a period of **ONE (1) YEAR**
commencing on October 01, 2020 to September 30, 2021.

**C.  WORK DAYS AND HOURS:** The Employee's work days and hours shall be **MONDAY** to **FRIDAY,** from **7:30am** to **4:30pm** , for a total of **40** hours per week.
\*\*\* Flexible time schedule and days-off as per owner's request but not less than forty(40) hours a week.

**D.  COMPENSATION:** In consideration of the services to be performed by the Employee, the Employer agrees to pay the Employee compensation in the amount of:

| | | | |
|---|---|---|---|
| 1. | $9.76 | per | hour |
| 2. | x 1.50 | per | hour |
| | for overtime compensation payable by check in bi-weekly intervals. | | |
| 3. | Other compensation (bonuses, commissions, etc.); specify amount and method of calculation: **NOTHING** | | |

**E.  DEDUCTIONS:** CNMI taxes and Social Security, if applicable, shall be withheld from the Employee's salary each pay period.  No other deductions from the Employee's compensation shall be made by the Employer unless specified herein and approved by the Chief of Labor or his authorized designee.  Other deductions (set forth amount and purpose of deduction):

**F.  PRINCIPAL PLACE OF WORK:** The Employee's principal place of employment shall be on **GARAPAN , SAIPAN , CNMI** However, the employee may be required to perform his/her duties at the other senatorial districts within the CNMI depending on the nature of the Employer's business and upon the Employer's compliance with applicable labor policies and/or regulations.

**G.  TRANSPORTATION:** The Employer shall be responsible for the payment of the Employee's return airplane ticket to his/her point of hire at the expiration or termination of the Employment Contract, regardless of the nature of the termination.

**H.  INSURANCE/MEDICAL EXPENSES:** The Employer shall not be responsible and liable for the medical insurance or payment of all medical expenses of the Employee.

**I.  NOTIFICATION OF NEXT-OF-KIN:** In the case of an emergency involving serious illness, accident or death of the Employee, the Employer shall immediately notify the Employee's next of kin whose name and address are as follows:

LEONINA ARMIA
PASAY CITY MANILA

J. **TERMINATION:** This Contract may only be terminated for cause by either party by giving the other party **TEN (10)** days advance written notice and only after an unsuccessful good faith attempt to settle any dispute has been made with the Chief of Labor or his designee.

    1. In the event of termination for cause, the Employer shall pay the Employee's wages or salary for work or services performed or for work not performed when an Employer refuses to allow the Employee to continue working through the effective date of the termination and shall purchase a one-way ticket for the return of the Employee to his/her point of hire.

    2. Termination for cause may include any of the following:

        a. **THREE (3)** unauthorized absences and/or **THREE (3)** unauthorized tardiness to work by Employee;

        b. Neglect, careless performance, non-performance or non-completion of assigned work by the Employee;

        c. Conviction in the CNMI of any felony or two or more misdemeanors;

        d. Abandoning of job or assigned duty by the Employee;

        e. Incompetence or misrepresentation of the qualifications, skills, physical or mental fitness to satisfactorily perform the duties for which the Employee was hired;

        f. Extreme cruelty or abuse, physical or otherwise;

        g. Unreasonable delays in the payment of the employee's wages or salary;

        h. A breach of any provision of this Contract and not corrected within TEN (10) days.

        i. Cessation of business activities or bankruptcy;

        j. Others (specify) :

K. **TERMINATION FOR ECONOMIC NECESSITY.** This contract may be terminated for business necessity : (a) In the event of business closure by giving the employee at least (30) days advance written notice and in compliance with the Federal Worker Adjustment and Retraining Notification Act. (b) In the event of reduction in force by giving the employee at least thirty (30) days advance written notice.

L. **SETTLEMENT OF DISPUTE:**

    Grievance and Good Faith Settlement

        Any dispute between the employer and the employee shall be addressed promptly. Employer and employee grievances or complaints and responses shall be in writing.

M. **REMITTANCE/OTHER OBLIGATIONS:** The Employee shall be responsible for remitting any money to his/her family and payment of any taxes as required by his/her government in his/her country of origin.

N. **ENTIRE AGREEMENT:** The foregoing terms and conditions constitute the sole, entire agreement of the parties herein and shall supersede any other agreement, either written, verbal, or otherwise.

    **IN WITNESS WHEREOF,** the parties hereto affix their names on the date and space so specified.

DATE: _____     ROEL R. VILLACRUSIS/GENERAL MANAGER

                                      EMPLOYER

                             (PRINT NAME TITLE AND SIGN)

DATE: _____     PROSPERO ALERTA ARMIA

                                      EMPLOYEE

                             (PRINT NAME AND SIGN)

Exhibit B

# PHILIPPINE OVERSEAS EMPLOYMENT ABMINISTRATION

## STANDARD EMPLOYMENT CONTRACT
## FOR VARIOUS SKILLS

This employment contract is executed and entered into by and between:

A.  Employer:   HOMESMART CORPORATION dba BEST DEAL
                GENERAL MERCHANDISE
    Address:    P.O. BOX 504974 SAIPAN MP 96950

    P.O. Box No.: P.O. BOX 504974 SAIPAN MP 96950
    Tel No. :    (670) – 235 - 8778

B.  Represented in the Philippines by:

    Name of Agent / Company:   Globalmanpower Management &
                               Development Corporation
    Address:    2/F Sherwood Place 2264 Taft Ave. Malate, Manila 1004

                        - and –

C.  Employee:   GIOVAN MALAZARTE
    Civil Status:   Married          Passport No.: ███████
    Date & Place of Issue: July 18, 2015;  DFA MANILA
    Address:    MATAG-OB LEYTE  , PHILIPPINES

Voluntary binding themselves to the following terms and conditions:

1.  Site of Employment:  SAIPAN

2.  Contract Duration:   12 Months commencing from employee's departure
                         from the point of origin to the site of employment.

3.  Employee's Position: Retail Salesperson

4.  Basic Monthly Salary:          USD$ 8.57 / Hour    - USD$ 1,371.20/Month

5.  Regular Working Hours:        MONDAY TO FRIDAY / 7:30 AM to 4:30 PM

6.  Overtime Pay:
        a.  For work over regular working hours: 150%
        b.  For work on designated rest days and holidays: 200%

7.  Leave with Full Pay:
        a.  Vacation Leave per:   As per SAIPAN, CNMI Labor Law
        b.  Sick Leave per:       As per SAIPAN, CNMI Labor Law

Seipan C--
VERIFIED

Glicerio DM. A···
Honorary ··· ···
Fee $   10   C ·  740819  Date 10/15/19

8. Free transportation from the site of employment and in the following cases, free return transportation to the point of origin:
   a. expiration of contract
   b. termination of contract by the employer without just cause
   c. if the employee is unable to continue to work due to work connected or work aggravated injury or illness
   d. force majeure
   e. in such other cases when contract of employment is terminated through no fault of the employee.

9. Free food or compensatory allowance of US$ _XX,_ free suitable housing.

10. Free emergency medical and dental services and facilities including medicine.

11. Personal life accident insurance in accordance with host government and/or Philippine government laws without cost to the worker. In addition, for areas declared by the Philippine government as war risk areas, a war risk areas insurance of not less than P100, 000 shall be provided by the employer at no cost to the worker.

12. In the event of death of the employee during terms of this agreement, his remains and personal belongings shall be repatriated to the Philippines at the expense of the employer. In the case repatriation of the remains is not possible, the same may be disposed of upon prior arrival of the Employee's next of kin and / or by the Philippine Embassy/Consulate nearest jobsite.

13. The Employer shall assist the employee in remitting a percentage of his salary through the proper banking channel or other means authorized by laws.

14. Termination:

    a). Termination By the Employer: The Employer may terminate this contract on the following just causes: serious misconduct, willful disobedience of Employer's lawful orders, habitual neglect of duties, absenteeism, insubordination, revealing secrets of establishment, when Employee violates customs, traditions and laws of _Saipan, CNMI_ and/or terms of this Agreement. The Employee shall shoulder the repatriation expenses.

    b). Termination by Employee: The Employee may terminate this Contract without serving any notice to the Employer for any on the following just causes: serious insult by the employer or his representative, inhuman and unbearable treatment accorded the employee by the employer or his representative, commission of a crime/offense by the employer or his representative. Employer shall pay the repatriation expenses back to the Philippines.

    b.1) The Employee may terminate this Contract without just cause by serving one (1) month in advance written notice to the Employer. The Employer upon whom no such notice was served may hold the employee liable for damages. In any case, the employee shall shoulder all expenses relative to his repatriation back to his point of origin.

c). Termination due to Illness: Either party may terminate the contract on the grounds of illness, diseases or injury suffered by the employee. The Employer shall shoulder the cost of repatriation.

15. Settlement of Dispute: All claims and complaints relative to the employment contract of the employee shall be settled in accordance with Company policies, rules and regulations. In case the employee contests the decision of the Employer, the matter shall be settled amicably with the participation of the Labor Attache or any authorized representative of the Philippine Embassy/Consulate nearest the site of employment. In case the amicable settlement fails, the matter shall be submitted to the competent or appropriate government body in host country or in the Philippines if permissibly by host country laws at the option of the complaining party.

16. The Employee shall observe Employer's company rules and abide by the pertinent laws of the host country and respects its customs and traditions.

17. Applicable Law: Other terms and conditions of the employment which are consistent with the above provisions shall be governed by the pertinent laws of **SAIPAN, CNMI .**

IN WITNESS WHEREOF , we hereby sign this contract this_____day of _____ 2019 at Manila, Philippines.

**EMPLOYEE:**                                              **EMPLOYER:**

NOV 22, 2019

JOVAN MALAZARTE

NIMFA V. JIMENEZ                                    RUEL R. VILLACRUSIS
**GLOBALMANPOWER MANAGEMENT**      **HOMESMART CORPORATION**
**AND DEVELOPMENT CORP**                   **dba BEST DEAL GEN. MDSE.**


**Witness**            NOV 06 2019.                          **Witness**

Exhibit C

**Department of Labor and Employment**
**Philippine Overseas Employment Administration**

## CONTRACT OF EMPLOYMENT

This employment contract is executed and entered into by and between:

RJCL CORPORATION DBA RNV CONSTRUCTION
*EMPLOYER*

|  |  |
|---|---|
| *P.O. Box No:* | P.O. Box 504974, Saipan MP 96950 |
| *Tel No.:* | (670) 235-8778/ (670) 234-7688 |

B.    Represented in the Philippines by:

**VENTURE MANAGEMENT SYSTEMS INTERNATIONAL CORPORATION**
**Unit 707-3 Columbia Complex, Ninoy Aquino Ave, Parañaque City 1704**

And
CELESTIAL, RANIE ESPERANZATE
*EMPLOYEE*

*Civil Status:*    Single       *Passport No.:* ▉▉▉▉▉
*Date & Place of Issue:*    August 15, 2017 ;     DFA NCR Northeast
*Address:*    Bronco St. Village East Brgy. Sto Domingo Cainta Rizal

Voluntarily binding themselves to the following terms and conditions:

1. Site of Employment Beachroad, Garapan Saipan MP 96950
2. Contract Duration  12 Months  commencing from employee's departure from the point of origin to the site of employment.
3. Employee's Position Fixtures and Equipment Repairer
4. Basic Monthly Salary $ 8.33 US Dollar per Hour       : $ 1,332.80 US Dollar per Month
5. Regular Working Hours: Maximum of 8 hrs per day, six days a week
6. Overtime Pay:
    a. For work over regular working hours: as per Saipan, CNMI Labor Law
    b. For work on designated rest days & holidays as per Saipan, CNMI Labor Law
7. Leave with full pay:
    a. Vacation Leave as per Saipan, CNMI Labor Law
    b. Sick Leave as per Saipan, CNMI Labor Law
8. Free transportation to the site of employment and in the following cases, free return transportation to the point of origin:
    a. Expiration of contract
    b. Termination of the contract by the Employer without just cause
    c. If the Employee is unable to continue to work due to work connected or work aggravated injury or illness
    d. Force majeure, and
    e. In such other cases when contract of employment is terminated through no fault of the employee

9. Free food or compensatory allowance of US$ XX, free suitable housing.

10. Free emergency medical and dental services and facilities including medicine.

11. Workmen's compensation benefits for services-connected illness or injuries or death in accordance with the pertinent laws of SAIPAN.

12. In the event of death of the employee during the terms of this agreement, his remains and personal belongings shall be repatriated to the Philippines at the expense of the Employer. In case the repatriation of remains is not possible, the same may be disposed of upon prior approval of the employee's next of kin and or by the Philippine Embassy/Consulate to the jobsite.

13. The employer shall assist the employee in remitting a percentage of his salary through the proper banking channel or other means authorized by law.

14. Termination: Neither party may unilaterally cancel the contract except for legal, just and valid cause(s):



   a. Termination by Employer - the Employer may terminate this contract on grounds of closure or cessation of operation of the establishment/undertaking or due to retrenchment to prevent losses, by serving a written notice to the employee at least one (1) month before the intended date thereof or payment of separation/termination pay equivalent to one (1) month salary. The Employer shall bear the repatriation expenses of the Employee. The Employer may also terminate this contract on the following just causes: serious misconduct, willful. disobedience of Employer's lawful orders, habitual neglect of duties, absenteeism, insubordination, revealing secrets of establishment, engaging in trade union activities, when employee violates customs, traditions, and laws of  SAIPAN and/or terms of this agreement. The Employee shall shoulder the repatriation expense.

   b. Termination by the Employee - The Employee may terminate this Contract by one (1) month in advance written notice to the Employer. If no notice is sent, the employee shall shoulder all expenses relative to his repatriation back to his point of origin. The employer may also terminate this Contract without serving any notice to the Employer for any of the following just causes; serious insult by the Employer or his representative; inhuman and unbearable treatment accorded the Employee by the Employer or his representative; commission of a crime / offense by the Employee or his representative. Employer shall pay the repatriation expenses back to the Philippines.

   c. Termination due so illness: Either party may terminate the Contract on the ground of illness, disease or injury suffered by the Employee. The Employer shall shoulder the cost of repatriation.

15. Settlement of Disputes: All claims and complaints relative to the employment contract of the Employee shall be settled in accordance with Company policies, rules and regulations. In case the Employee contests the decision of the Employer, the matter shall be settled amicably with the participation of the Labor Attaché or any Authorized representative of the Philippine Embassy / Consulate nearest the site of Employment. In case the amicable settlement fails, the matter shall be submitted to the competent or appropriate government body in (host country) or in the Philippines if permissible by host country laws at the option of the complaining party.

16. The Employee shall observe Employer's Company rules and abide by the pertinent laws of the host Country and respect its customs and traditions.

17. Solidary Liability: The liability of the principal/employer and the recruitment/placement agency on any and all claims under this rule shall be joint and solidary during the entire period or duration of the employment

contract and shall not be affected by any substitution, amendment or modification made locally or in a foreign country of the said contract.

18. Other terms and conditions of employment not covered herein shall be governed by the pertinent laws of the country of employment without negating or rendering nugatory other applicable laws in the Philippines and International covenants on expatriate employment.

Effectivity of contract to commence upon departure of worker from point of hire.

In witness thereof, we hereby sign this contract this _____ the day of _____, at Manila, Philippines.

_____          _____
RANIE ESPERANZATE CELESTIAL                               RUEL RARO VILLACRUSIS
**Employee**                                                              **Employer**

**VENTURE MANAGEMENT SYSTEMS INT'L. CORP.**
**Philippine Representative**

_____          _____
**Witness**                                          RICHARD A. BONIFACIO
                                                    **Witness**

POEA REGISTERED stamp:
PRE-EMPLOYMENT SERVICES OFFICE ∘ LAND BASED CENTER

REGISTERED
REG NO. _____
VALID UNTIL _____
E.C NO _____
DATE _____
SIGNATURE
**POEA**

8895601  2/26/2020

Exhibit D

**RNV CONSTRUCTION**

# Memo

**To:** RNVC Workers

**From:** THE MANAGEMENT

**Date:** 9/22/2022

**Re:** Resignation procedure

---

This is to remind everyone of the resignation procedure as follows:

- **Resignation Notice** – Any employee who wishes to resign must provide a resignation letter at least thirty (30) days prior to the effective date of resignation.

- **Breach of Employment Contract** – If a CW1 worker signed a new employment contract *(CW1 application for extension of stay)* it automatically sets the new employment contract for the next fiscal year. If the employee failed to fulfill its obligation as stipulated in the employment contract, the employee has to shoulder the cost incurred for their papers' processing. Likewise, the company reserves the right to file for any legal claim/damages.

- **Repatriation Ticket** – If the employee failed to finish his contract, the employee must be responsible for the airfare cost. The company will only shoulder the airfare of those employees who were able to finish their employment contract and have not signed for a CW1 renewal/extension.

- **Tax Rebate** – To those employees who were leaving for good, each of you must obtain a *"Special Power of Attorney"* to process your tax rebate. You should appear at Pacific Quick Print to sign the form and have it notarized as well.

Sincerely,

**RUEL R. VILLACRUSIS**
General Manager